**SWISS CREDIT BANK,**
**Plaintiff-Appellee,**

v.

**Henry BALINK, Defendant-Appellant.**

**No. 77–1880.**

United States Court of Appeals,
Tenth Circuit.

Argued March 14, 1979.

Decided Feb. 13, 1980.

Rehearing Denied March 17, 1980.

---

Paul M. Fish, of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N.M., for plaintiff-appellee.

Henry G. Coors, IV, of Coors, Singer, Anaya, Brennan & Stratton, P. A., Albuquerque, N.M. (Saul Cohen of Olmsted & Cohen, Santa Fe, N.M., with him on the brief), for defendant-appellant.

Before SETH, Chief Judge, LOGAN, Circuit Judge, and MILLER, Judge *.

LOGAN, Circuit Judge.

This appeal arises out of a suit brought by Swiss Credit Bank, located in Switzerland, against Henry Balink for return of $11,500 it paid to him on a check over a stop payment order. Judgment was entered, after trial, in favor of the Bank on the basis of subrogation under what is now N.M.Stat. Ann. § 55–4–407 (1978) and the common law theory of unjust enrichment. Balink appealed.

The dispute has its origins in an agreement for the sale of a sculpture between Balink, an art dealer, and Wyoming Foundry Studios Establishment, a Lichtenstein corporation wholly owned by Harry Jackson, who created the sculpture being reacquired.[1] In October 1973 Balink delivered the sculpture and Wyoming gave him a check drawn on the Bank for $11,500. Wyoming then stopped payment on the check, apparently because it thought the deal was unfavorable, and the Bank returned the check to Balink unpaid. Balink commenced a state court suit in New Mexico against Wyoming for payment; Wyoming counterclaimed, alleging damages caused by Balink's untruthful advertising of the sculpture. Before the suit was concluded Balink redeposited the check, and the Bank mistak-

---

* The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

1. Wyoming Foundry Studios Establishment's and Jackson's interests here are identical, Jackson having performed most of the acts involved here as the principal officer of Wyoming. Wyoming was drawer of the check. They will be referred to hereafter collectively as "Wyoming". Balink joined both as third party defendants in this suit. They won in the trial court, and Balink voluntarily dismissed the appeal to this Court against them.

enly paid it over the stop payment order.[2] When Wyoming's account reflected the payment it informed the Bank of the mistake. The Bank consequently credited the account and demanded return of the money from Balink in February 1975. Balink did not return the money. Approximately two months later, in April 1975, Wyoming and Balink settled the state court suit, thereby resolving all disputes between them. Balink received thirteen Macaione paintings and $500, and Wyoming dismissed its false advertising counterclaim. The settlement did not purport to bind the Bank, which was not a party and did not learn of the settlement until later. Approximately a year later the Bank brought this suit against Balink for return of the money.

N.M.Stat.Ann. § 55–4–407 provides as follows:

> If a payor bank has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights:
>
> . . . . .
>
> (c) of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose.

This section has two requirements applicable to the situation here—unjust enrichment and loss to the bank. Both are satisfied.

■ For there to be unjust enrichment, Balink must have received payment twice. A crucial question, therefore, is whether the settlement Balink received duplicated the $11,500 payment on the check. Asserting that he would not have settled for what he did had he not received the $11,500 already in his possession, Balink argues that the settlement was in addition to the check payment. That Balink wanted to retain both the $11,500 and the settlement payments is not dispositive, of course. The record shows Balink could not have reasonably believed he held the Bank's payment free and clear. The Bank had demanded return of the money two months before the settlement was reached. Balink clearly knew of this demand, and he could not reasonably conclude the Bank would not pursue its claim simply because it had taken no action during those two months. This is particularly so in light of the international setting, the bank being in Switzerland.

In addition, the settlement placed Balink in essentially the same position as receiving $11,500 in cash. Although the value of the settlement was disputed, the trial court found against Balink, ruling that were Balink allowed to retain the $11,500 payment on the check in addition to the settlement, he would be unjustly enriched. This conclusion is not clearly erroneous. The judge found the thirteen paintings Balink received were worth $9,400, which is supported by Balink's own testimony. This value plus the $500 cash totals only $1,600 less than the amount of the check. Wyoming dismissed what apparently was a legitimate claim of false advertising of the sculpture, which could reasonably be worth $1,600 to Balink. There were other claims by both sides in the state court suits, but only for offsetting punitive damages and attorneys' fees.

If the Bank could not charge Wyoming's account, it clearly suffered a loss here by paying out $11,500. The parties stipulated in the pretrial order that Swiss law controlled the relationship between the Bank and Wyoming. Balink contends that the Swiss law was never adequately proved. But the Bank submitted a letter from its legal counsel in Switzerland that set forth the applicable law and the legal conclusion that the Bank could not charge the account. Balink presented no evidence to the con-

---

2. The check had been dated October 7, but with no year given. Balink redeposited it in late October, one year later. This may have misled the Bank and resulted in the erroneous payment. However, there were stamps on the back of the check showing it had been presented before.

trary, relying entirely upon the argument that the evidence is of little probative value. Fed.R.Civ.P. 44.1 gives the court wide latitude in determining foreign law, and it can consider any relevant material. The unrefuted evidence presented here is sufficient to establish the determination of Swiss law. The Bank suffered loss.

Since the two requirements are met, we have no trouble concluding the Bank was subrogated under section 55–4–407 to any rights Wyoming had against Balink. Here Balink makes its principal argument: in determining what those rights were, we can only look at the position of the parties at the time the check was paid. At the time the Bank paid the check Balink asserts Wyoming had no rights against him to defend against the payment of the $11,500. Of course, the settlement precluded a court determination of that point.[3] He also contends that the order of the payments is significant—since he received the check payment first, it could not be unjust enrichment. We do not agree.

The normal scheme of the Uniform Commercial Code (UCC) contemplates that a bank making an erroneous payment over a stop order can recover from either the drawer or payee. If the drawer has no defense to payment of the check, the bank recovers by charging the drawer's account. If the drawer has a defense, then the bank recovers as a subrogee to the drawer's right against the payee. *See* N.M.Stat.Ann. § 55–4–403(3), –407(b), & Official Comment 1 (1978).

█ The present case is unusual in that Wyoming settled and paid the Balink claim after the Bank had mistakenly paid the check, and because Swiss law, applicable here, did not permit the charge against Wyoming's account at the time of the payment, which would have been allowed under normal application of the UCC. Had the check been held until after the settlement, then sent through and mistakenly

paid, clearly Balink would lose. Wyoming would have the settlement as a *res judicata* defense to a suit on the check. The Bank, subrogated to Wyoming's rights under the UCC, would be able to collect from Balink. We see no reason here why the fact the Bank paid the claim by mistake before the settlement, rather than after, should make any difference. Section 55–4–407 was intended to provide a broad, liberal remedy that incorporated and is based upon the common law equitable principles of unjust enrichment and restitution. It has been applied when "the technical mechanical requirements of common-law subrogation have not been met." *Sunshine v. Bankers Trust Co.*, 34 N.Y.2d 404, 358 N.Y.S.2d 113, 122, 314 N.E.2d 860, 866, *modified as to costs award*, 34 N.Y.2d 994, 360 N.Y.S.2d 419, 318 N.E.2d 608 (1974). *See also South Shore Nat'l Bank v. Donner*, 104 N.J.Super. 169, 249 A.2d 25 (1969). *Cf. Manufacturers Hanover Trust Co. v. Ava Industries, Inc.*, 98 Misc.2d 614, 414 N.Y.S.2d 425, (Sup.Ct. 1978) (in particular circumstances settlement between parties does not diminish rights of bank under this section). Balink received payment of his claim from both Wyoming and the Bank, as the trial court found. Wyoming's right to assert *res judicata* should pass to the Bank under equitable principles.

The judgment of the district court is affirmed.

---

**3.** A defense of "inequity of being coerced to pay for its own sculpture" was asserted in the state action but not adjudicated because of the settlement. Here we assume that defense to payment would not have prevailed.