**HOME INDEMNITY CO.,**
**Plaintiff-Appellant,**

v.

**The FIRST NATIONAL BANK OF WAUKEGAN and Willtrue Loyd, Defendants,**

**The First National Bank of Waukegan, Defendant-Appellee.**

No. 80–2206.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1981.

Decided Sept. 15, 1981.

Rehearing Denied Oct. 21, 1981.

---

11. *See, e. g.*, Paragraph 3, plaintiffs' amended complaint.

Cornelius F. Riordan, McNeela & Griffin, Ltd., Chicago, Ill., for plaintiff-appellant.

Stephen R. Swofford, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and MARKEY *, Chief Judge.

* Chief Judge Howard T. Markey of the United States Court of Customs and Patent Appeals, is sitting by designation.

PELL, Circuit Judge.

This case presents an archetypical example of the "forged payee" scenario in which the depository bank and the payor each claim the other is liable for the resulting loss. The undisputed facts as found by the district court are as follows.

Home Indemnity Company (Home) is an insurance company incorporated under the laws of New Hampshire with its principal place of business in New York City. For some time Home has maintained an agreement with the Hartford National Bank and Trust Company (Hartford) whereby drafts issued by Home in satisfaction of insurance claims against it are "payable through" Hartford and are ultimately paid by Home. On July 19, 1977, Home issued such a draft in the amount of $18,000 payable jointly to Mary Taylor and Howard Lidov, her attorney. On July 23, 1977, defendant Willtrue Loyd presented the draft for deposit in his account at the First National Bank of Waukegan (Waukegan). Loyd apparently had forged both Taylor's and Lidov's signatures on the draft, but in response to questions asked at the time by one of the bank's officers, Fred Fettinger, Loyd said that he had obtained the draft in consideration for Taylor's and Lidov's purchase of a parcel of land. Fettinger accepted the draft for deposit in Loyd's account on the condition that no withdrawals be made from the deposit for about two weeks.

Three days later, on July 26, Lidov informed Abraham Drayer, a Home claims agent in Chicago, that he had not yet received the draft. Drayer told Lidov that he would issue a stop payment order and have a replacement draft issued. On the same day Hartford received the draft through normal banking channels from Waukegan, paid it, and forwarded it to Home's office in New York which accepted it for payment.

Six days later, on August 1, Home's clerical department in Chicago was directed by

Drayer to issue the stop payment order. The order was prepared and mailed to New York on the next day. For unexplained reasons, however, the order was not received in New York until one week later, on August 8. Once in New York, the order was compared to Home's records to see whether or not the draft had been paid. On August 11, the New York office mistakenly decided that the draft had not been paid and that payment could effectively be stopped, and transmitted this erroneous information to Chicago. A new draft was issued on August 12.

On August 29, apparently after Home had become aware that the draft in fact had been paid, Taylor informed Home in response to an inquiry that her signature on the first draft had been forged. Home initially contacted the Waukegan Bank about the forgery on September 9, and on September 26, Home obtained from Taylor an affidavit of forgery and formally presented it to the Waukegan Bank. By that time, however, Loyd had withdrawn the entire $18,000 from his account, $6,000 on August 8 and an additional $12,000 on August 9.

■ The ultimate issue on appeal is, of course, who between Home and Waukegan should bear the loss for Loyd's forgery. Home claims that it should be reimbursed by Waukegan because the bank breached the warranty of good title it impliedly made

under the Uniform Commercial Code § 4–207(1)(a), Ill.Rev.Stat. ch. 26, § 4–207(1)(a),[1] when it forwarded the draft for payment with the forged payee's signature. Waukegan claims and the district court decided, on the other hand, that Home cannot rely upon the warranty because it failed to notify Waukegan of the fraud within a reasonable time after becoming aware of it as required by § 4–207(4), Ill.Rev.Stat. ch. 26, § 4–207(4).[2] The trial court found that Home was placed on "reasonable notice of the breach" on July 26, the date Lidov informed Drayer that he had not received the draft and the date the draft was paid by Home in New York. The court concluded that because Home did not issue the stop payment order until August 11, two days after Loyd withdrew the proceeds of the draft from his account, and did not inform Waukegan of the forgery until September 9, it could not proceed on the warranty theory. The court therefore granted summary judgment to Waukegan.

Section 4–207(1)(a) of the Uniform Commercial Code, Ill.Rev.Stat. ch. 26, § 4–207(1)(a), is a codification of the prior law which required those with knowledge of a fraud to notify those who might be liable as soon as possible in order to avoid or lessen any loss. In *Magid v. Drexel National Bank*, 330 Ill.App. 486, 71 N.E.2d 898, 902 (1947), for example, the court dismissed the plaintiffs' suit against a bank for paying

1. Section 4–207(1)(a) provides:
   (1) Each customer or collecting bank who obtains payment or acceptance of any item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that
   (a) he has good title to the item or is authorized to obtain payment on behalf of one who has good title; . . .
   Waukegan has presented the additional argument, relying upon *Life Insurance Company of Virginia v. Snyder*, 141 N.J.Super. 539, 358 A.2d 859 (1976), and *Stone & Webster Engr. Corp. v. First Nat. Bank & T. Co.*, 345 Mass. 1, 184 N.E.2d 358 (1962), that Home cannot rely upon § 4–207(1)(a) because it was a "drawer" and not the "payor" of the draft. Notwithstanding the correctness of this position in the forged check-payee situation, we are satisfied that in light of the clear notation on the draft in

this case indicating that it was only "payable through" the Hartford Bank, Home, unlike the drawers in the cited cases, was indeed the payor of this draft and thus technically may rely upon the warranty section. Ill.Rev.Stat. ch. 26, § 4–105(d); *Aetna Casualty & Surety Co. v. Traders Nat. Bank & T. Co.*, 514 S.W.2d 860 (Mo.App.1974); and *see First Fed. Sav. & L. Assoc. of New Bern v. Branch Banking & T. Co.*, 282 N.C. 44, 191 S.E.2d 683 (1972), and *Phelan v. University Nat. Bank*, 85 Ill.App.2d 56, 229 N.E.2d 374 (1967).

2. Section 4–207(4) provides:
   Unless a claim for a breach of warranty under this Section is made within a reasonable time after the person claiming learns of the breach, the person liable is discharged to the extent of any loss caused by the delay in making the claim.

upon a forged payee's signature because the plaintiffs had waited more than four months after they became aware of the forgery to notify the bank.

What notification would be deemed "reasonable" in a specific case depends, of course, upon the activities reviewed and the surrounding circumstances. *First Fed. Sav. & L. Assoc. of New Bern v. Branch Banking & T. Co.*, 282 N.C. 44, 191 S.E.2d 683, 692 (1972). In some cases, quite lengthy delays in reporting forgeries will not defeat the warranty claim if no damages resulted from the delays. *E. g., Michigan Nat. Bank v. American Nat. Bank & T. Co.*, 34 Ill.App.3d 30, 339 N.E.2d 375 (1975); *Birmingham Trust Nat. Bank v. Central Bank & T. Co.*, 49 Ala.App. 630, 275 So.2d 148, 153 (1973), *cert. denied*, 290 Ala. 362, 275 So.2d 153 (1973); *First State Bank & T. Co., supra.* In this case, however, we find that the record supports the trial court's conclusion that Waukegan would have been able to avoid the loss had Home informed it of the probable forgery within a reasonable time after it acquired sufficient information, and that Home failed to do so. The record reflects a substantial number of instances of Home's dilatory behavior including Drayer's delay of six days to direct the issuance of the stop order, the unexplained seven-day delay before the order arrived by mail in New York, the mistaken decision that the draft had not been paid, the twenty-one day delay in discovering that the draft had in fact been paid, and the ten-day delay even after that discovery to inform Waukegan about the forgery. This is all in addition, furthermore, to the eighteen-day delay in obtaining and forwarding Taylor's affidavit. Through this series of delays Waukegan was kept unaware of the facts for more than six weeks. In the light of modern methods of communication with the availability of immediate electronic and telephonic transmission of information, the district court was warranted in finding the delay unreasonable as a matter of law.

We reject Home's position that it was not under any duty to inform Waukegan of the probable forgery until it obtained the affidavit from Taylor. Although Home contends some state courts have implied this requirement, *see Twellman v. Lindell Trust Co.*, 534 S.W.2d 83, 99 (Mo.App. 1976), and *Birmingham Trust Nat. Bank v. Central Bank & T. Co., supra*, the Code nowhere imposes such a requirement and to do so and allow the payor to protect itself behind the payee's delay in providing the affidavit would defeat the purposes of the warranty limitation to encourage prompt notification and to lessen or avoid losses due to forgeries.[3] We hold sufficient knowledge to impose the 4–207(4) duty can be based upon the payor's agent's knowledge that the check or draft had been paid although the check or draft had not been received by the payee. *See generally Northwestern Nat. Bank of Milw., Wis. v. Madison & Kedzie St. Bank*, 242 Ill.App. 22 (1926), *Magid, supra*, and *Gateway Nat. Bank of Chicago v. Saxe, Bacon & Bolan*, 336 N.Y.S.2d 668, 40 A.D.2d 653 (1972) (knowledge of agent imputed to principal). Thus, the payor must notify the depository bank within a reasonable time after acquiring this knowledge.

Although some delay by Home might be excused due to its large multi-state nature, the district court did not err in concluding that the corporation violated its duty adequately to inform Waukegan when it delayed issuing its stop-order for eleven days after its decision to do so. Whether or not Home's duty was violated as early as July 26 when it first obtained knowledge of the fraud, as the district court held, the duty certainly was violated when Home failed to notify Waukegan by the time Loyd withdrew the proceeds on August 8 and 9, and failed to do so until September 9, long after Waukegan lost any chance of recovering the money. On the other hand, we do not find that Waukegan was negligent in freezing Loyd's account for two weeks, a

---

**3.** Home itself did not impose this requirement as it notified Waukegan eighteen days before it received the affidavit.

period that in these circumstances would have been adequate to allow Home to notify properly the Bank had it acted expeditiously. Home acquired sufficient knowledge of the probable forgery only a few days after Loyd deposited the draft at Waukegan and, in fact, Drayer decided to issue the stop-order at that time. Whether this period would be adequate in other cases is, of course, not an issue before this court. In these circumstances and for the reasons stated, however, the district court's grant of summary judgment to Waukegan is

AFFIRMED.